**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00572-CRC** |
| **v.** | : | |
| | : | |
| **JOSHUA DRESSEL,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Joshua Dressel to 45 days of incarceration followed by three-years of probation, 60 hours of community service, and $500 restitution.

I.      **Introduction**

Defendant Joshua Dressel participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Dressel pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 45 days of incarceration followed by three-years of probation, 60 hours of community service, and $500 restitution is appropriate in this case because Dressel (1) observed chaos and violence against police officers on the West Plaza of the Capitol grounds and watched other rioters trample over barricades, climb scaffolding, scale walls, and physically struggle with police; (2) climbed an approximate ten-foot high banister of the northwest stairs that led to the Upper West Terrace and the Capitol building; (3) directed and helped other rioters, from atop the banister, climb up overturned bike racks to the top of the banister; (4) ascended the northwest stairs to the Upper West Terrace outside of the Senate Wing Doors, the site of one of the most consequential breaches of the Capitol, and entered the doors approximately two minutes after the doors had been breached; (5) was among the first wave of rioters who entered the Crypt and clashed with police there; (6) deleted videos he recorded of the January 6 assault on the Capitol from his mobile telephone and from his Facebook account; (7) minimized his unlawful conduct during an interview with FBI agents, and (8) has not sincerely expressed genuine remorse for his conduct on January 6.

The Court must also consider that Dressel's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Dressel's crime support a sentence of 45 of incarceration followed by three-years of probation, 60 hours of community service, and $500 restitution.

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the Capitol. (Attachment 1: Statement of Offense Dated August 16, 2022)

*Defendant Dressel's Role in the January 6, 2021 Attack on the Capitol*

The defendant, Joshua Dressel, who lives in Missouri, traveled to Washington, D.C., prior to January 6 with others. The purpose of Dressel's trip was to protest Congress' certification of the 2020 Electoral College vote.

After attending the former President's rally, Dressel walked to the west side of the Capitol grounds. While enroute, Dressel learned that rioters were planning on entering the Capitol building.  Rioters had toppled barricades established by the United States Capitol Police that consisted of metal bike racks, physically linked end to end.  Workers had erected scaffolding over a staircase that led to the building's Upper West Terrace in preparation for the upcoming presidential inauguration. Alongside the staircase and scaffolding was a banister that was approximately ten feet tall. Rioters stacked metal bike racks against the banister to build a makeshift ladder system that allowed rioters to climb atop the banister.  Rioters then used the banister to access the staircase, Upper West Terrace, and the Capitol building. Law enforcement officers were positioned on the staircase and attempted to keep the rioters away from the building. However, the rioters were able to push past the officers and access the building.

Once on the West Plaza, Dressel scaled a bike rack to get to the top of the banister.  Once there, Dressel directed and assisted other rioters in scaling the banister.  (Images 1-4)



Image 1



Image 2



Image 3



Image 4

Rioters in this location were also climbing the scaffolding and scaling other walls to access the building.  On the ground below, Dressel watched from the top of the banister as rioters were physically clashing with police and the encounters got more violent.  (Image 5)



Image 5

Despite the rapidly escalating situation and what Dressel described as a "rowdy" situation with pushing, yelling, and chanting, Dressel traveled across the banister and up the adjoining stairs to the Upper West Terrace outside of the Senate Wing Doors.  (Image 6)  Dressel was outside the Senate Wing Doors when it was breached.  (Image 7)



Image 6



Image 7

When the Senate Wing Doors were breached, rioters smashed a glass window, forced the doors opened, and caused the first breach of the Capitol building. (Image 8) The initial breach of that location occurred at 2:13 p.m.



Image 8

Approximately two minutes later, at 2:15 p.m., Dressel entered the Senate Wing Doors as alarms sounded.  (Image 9) Dressel was among the first group of rioters to make entry into the building.  Upon entering, Dressel is shown on video expressing excitement for making entry inside of the Capitol building.



Image 9

Dressel then walked through adjoining hallways where he was confronted with smoke. Instead of exiting, Dressel traveled to the Crypt where he remained for approximately 15 minutes. (Image 10)  Dressel was among the first wave of rioters to have an encounter in police in that area. There was eventually a physical struggle in Crypt between rioters and police.



Image 10

While in the Capitol, Dressel was captured on live video footage that aired on cable television.  A tipster submitted a screenshot of this footage was submitted to the FBI.  (Image 11)

Dressel then traveled back to the Senate Wing Door area and exited the building through a broken window at approximately 2:38 p.m. Dressel remained on the Capitol grounds until approximately 4:00 p.m.



Image 11

Dressel then traveled back to the Senate Wing Door area and exited the building through a broken window at approximately 2:38 p.m. Dressel remained on the Capitol grounds until approximately 4:00 p.m.

*Social Media Posts*

At the time of the attack on the Capitol, Dressel had a Facebook account. The account was created on January 14, 2007 and was deleted on February 7, 2021. Further records obtained from a court-authorized search warrant of Dressel's Facebook account revealed that Dressel discussed his presence inside the Capitol on January 6, 2021, with another Facebook user, Facebook User 1, via Facebook Messenger. Later in the day on January 6, 2021, Dressel and Facebook User 1 had the following conversation (indicated times of the conversation are approximate):

| | |
|---|---|
| Facebook User 1: | Good job today!!!! [5:41 p.m.] |
| Dressel: | First 20 people or so to break into the Capitol [5:45 p.m.] |
| Facebook User 1: | You're a fucking beauty!!!!!!  Was there antifa fucks in there? [5:50-5:51 p.m.] |
| Dressel: | Yes [5:52 p.m.] |

* * *

| | |
|---|---|
| Facebook User 1: | You still out on the streets? [5:57 p.m.] |
| Dressel: | Just now leaving. [6:00 p.m.] |
| Facebook User 1: | Will yas be back tomorrow? [6:01 p.m.] |
| Dressel: | Yes [6:02 p.m.] |
| Facebook User 1: | I have so many questions hahaha [6:02 p.m.] |
| Dressel: | Haha [6:02 p.m.] |
| Facebook User 1: | You guys are true patriots!!!! Should be fucking proud of yourselves.  [6:02 p.m.] |
| Dressel: | Thanks. Love ya brother! [6:27 p.m.] |
| Facebook User 1: | Now they're resuming the electoral count. After the curfew and everyone leaves. Some of these republican senators better reject it. [7:08 p.m.] |
| Dressel: | These mother fuckers!  [7:08 p.m.] |
| Facebook User 1: | It's unbelievable. I can only imagine how you furious you guys are.  I'm livid and I'm Canadian. [7:11 p.m.] |
| Dressel: | Dude this shit is fucking outrageous. It's crazy, swamp is larger [7:12 p.m.] |

Dressel and Facebook User 1 also discussed a video Dressel had apparently posted that

Facebook User 1 said depicted Dressel in the Capitol:

| | |
|---|---|
| Facebook User 1: | Just went to show the wife the video of you guys in the capitol. I see ya deleted it. Smart move lol [7:17 p.m.] |
| Dressel: | Lol  I'm proud to say I was a voice of reason in there trying to stop the crazy shit and calm things down [7:22-7:23p.m.] |
| Facebook User 1: | Im sure ya were. I was going to tell you ya should delete it. Don't give them any more notice to come and find you once they look at the cctv tapes inside the capitol. I gotta say. It's pretty fucking rad that you were there. I hate that the snakes are back in there now trying to resume the count after all the protestors were pushed out and curfew was set. Trying to sneak the steak in the cover of night. Fucking cowards. [7:27 p.m.] |

Dressel did not reply to Facebook User 1's comment regarding deleting the video.  The

records of Dressel's account obtained from Facebook did not include the video.

The  tipster who contacted the FBI and identified Dressel, said that they saw a live-streamed

video from Dressel's Facebook account that appeared to be taken from inside the Capitol on

January 6, 2021, and showed a large number of people chanting, "Stop the Steal."  By the time of

the interview with the tipster, however, Dressel's Facebook account appeared to be deleted, and the FBI could not review the video streamed from Dressel's Facebook page.

After the riot, Dressel became aware he had been captured on video inside the Capitol. In response, he deleted videos on his phone and his Facebook account.

*Dressel's FBI Interview*

As was his right, Dressel declined to speak with law enforcement officials before he pleaded guilty. As required by his plea agreement, Dressel was interviewed by the FBI on January 4, 2023. During the interview, he explained that he learned about multiple events taking place in Washington D.C. on January 6, 2021 through social media and associates. Dressel wanted to protest and voice his opposition to the 2020 election. Dressel advised that he had been to three prior rallies between the 2020 election and January 6. Two of the rallies were in Washington D.C. and one was in Georgia.

According to Dressel he traveled to Washington D.C. a few days prior to January 6 with friends. On the morning of January 6, he attended the rally. Shortly after the former President began to speak, Dressel and others began walking toward the Capitol and while enroute Dressel learned that rioters were planning on going inside the Capitol building.

Upon entering the west side of the Capitol grounds, Dressel observed all the security barricades had been toppled and rioters were scaling walls. Dressel used a bike rack to scale the wall to the top of banister of the northwest stairs. While there Dressel contended that he was helping elderly and injured individuals get down from the banister. However, open-source video shows that Dressel was doing more than merely helping the elderly and the injured. (Exhibit 1)[2]

---

[2] Exhibit 1 is an open-source video that was taken by another rioter and features Dressel on top of the banister of the northwest stairs. Image 2 and 3 on page four of this memorandum are still shots from the video.

In the video exhibit, Dressel appears to be directing rioters on how to scale the walls and aiding many in climbing up the banister.  From the top of the banister, Dressel watched rioters on the ground getting "rowdy" and physically confronting police officers.

Dressel then stated that he ascended the stairs to the Upper West Terrace and ultimately entered the building through the Senate Wing Doors.  According to Dressel, the doors were already opened when he entered, and he was not aware of any smashed windows or broken doors despite entering two minutes after the breached occurred and being outside of the doors when the breach was taking place.  Surveillance footage from the Senate Wing Doors shows that Dressel appeared to be enthusiastic when he entered.

Dressel made his way into the Crypt where he was among the first to encounter police officers.  He insisted that he tried to calm the crowd down, however, his presence among the mob of rioters significantly escalated the situation in this area.

Dressel then made his way back to the Senate Wing Door area and exited through a broken window.  Dressel stated that he did not witness any rioter breaking or stealing items from the Capitol building.  After exiting, Dressel admitted to staying on the grounds for 45 additional minutes.

Soon after the riot, Dressel learned that he was captured on video inside the Capitol and that video was broadcast on national television.  Dressel acknowledged taking photographs and videos from January 6 and posting at least one video on Facebook.  He further admitted that he deleted the video and his Facebook account after the riot.  During the interview, Dressel did not demonstrate remorse for his conduct on January 6.

*The Charges and Plea Agreement*

On June 29, 2021, the United States charged Dressel by criminal complaint with violating 18 U.S.C. § 1752(a)(1), Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds; 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct on Capitol Grounds; 40 U.S.C. § 5104(e)(2)(G), Parade, Demonstrate, or Picket in any of the Capitol Buildings. On July 13, 2021, Dressel was arrested. On September 13, 2021, the United States charged Dressel by a four-count Information with violating the same offenses contained in the criminal complaint. On August 18, 2022, pursuant to a plea agreement, Dressel pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parade, Demonstrate, or Picket in any of the Capitol Buildings. By plea agreement, Dressel agreed to pay $500 in restitution to the Department of the Treasury.

## II.      Statutory Penalties

Dressel now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Dressel faces up to six months of imprisonment and a fine of up to $5,000. Dressel must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days of incarceration, followed by three -years of probation, 60 hours community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Dressel's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Dressel, the absence of violent or destructive acts is not a mitigating factor. Had Dressel engaged in such conduct, he or she would have faced additional criminal charges.

As referenced throughout this memorandum, some of the most aggravating factors are Dressel's actions on the northwest stairs and West Plaza where he scaled the banister, assisted others to climb atop the banister, and witnessed violence against law enforcement.  Dressel was indifferent to the violence and mayhem and proceeded to enter the building.  Dressel was one of the first rioters to enter the building, which occurred two minutes after the breach of the Senate Wing Doors.  Dressel ignored the clear signs of a violent entry that included shattered glass on the

floor as alarms sounded and traveled further inside into the building.  Dressel eventually exited the building but stayed on the grounds for forty-five minutes.  After the riot, Dressel boasted about his involvement through social media but eventually destroyed evidence after the riot as he admitted to deleting videos from his phone and his Facebook account.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Dressel

As set forth in the presentence report, Dressel's criminal history consists only of traffic offenses.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

The need for specific deterrence for Dressel justifies incarceration followed by probation. As described throughout this memorandum, Dressel's actions in the underlying offense assisted and encouraged the violence and destruction that occurred on January 6. Dressel's seemingly lack of remorse at any time following January 6 also demonstrates the need for specific deterrence. Never again can Dressel engage in such behavior.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Dressel based on his own conduct and relevant characteristics, but should

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Dressel has pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a Class B misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants

charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272

(TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced imposed incarceration for defendants who was involved in the riot on the West Plaza and entered the Senate Wing Doors.

This Court sentenced co-defendants, Nolan Kidd and Savannah McDonald to 45 days and 21 days, respectively, in *United States v. Kidd, et al*, 21-cr-429 (CRC).  There are similarities between those defendants and Dressel.  Kidd and McDonald observed and cheered as the mob of rioters overran law enforcement on the northwest stairs.  Dressel was one of the rioters on the stairs who was part of that initial mob in that location.  Like Dressel, Kidd and McDonald proceeded to the building despite the violence that was occurring and all three (Kidd, McDonald, and Dressel) were among the first wave of rioters to enter the Capitol building.  Kidd and McDonald were inside the Capitol longer than Dressel.  All three filmed scenes of the chaos that day and posted them on social media.

In *United States v. Joshua Wagner*, 21-cr-310 (ABJ), Judge Berman Jackson sentenced the defendant to 30 days in custody for his participation in the riot. He entered the Capitol through the broken window next to the Senate Wing Door where Dressel entered. He disregarded instructions from the police and joined the crowd in chants. Just days after the riot, when he learned he was under investigation, Wagner, unlike Dressel, expressed regret and a willingness to cooperate, and quickly accepted responsibility. Wagner had no criminal history whatsoever.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. A sentence of 45 days of incarceration followed by three-years of probation is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2). The Court may impose such a sentence either under Section 3563(b)(10), with a term of imprisonment as a condition of probation, or as a split sentence under Section 3561(a)(3).

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[4]

---

[4] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10).  *See Anderson*, 787 F. Supp. at 539.  Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each

such interval is no more than 14 days.  *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation).   Imposing an intermittent confinement sentence with 45 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[5]

---

[5] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

IV.     **A sentence imposed for a petty offense may include both imprisonment and probation.**

The government's recommended sentence of 45 days of incarceration followed by three-years of probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses."  *Little*, 590 F.Supp.3d at 351; *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[6]

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Dressel to 45 days incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[6] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

/s/ *Matthew Moeder*
Matthew Moeder
Assistant United States Attorney
MO Bar No. 64036
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
(816) 426-4103
Matthew.Moeder@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2023 I caused a copy of the foregoing opposition to be served on defense counsel of record via email.

*/s/ Matthew Moeder*

Matthew Moeder
Assistant United States Attorney